IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**ENTERED**
OCT 23 2000

| | |
|---|---|
| MEDPARTNERS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO. 98-G-2155-S |
| DUN & BRADSTREET, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This cause came before the court on the motion of defendant Dun & Bradstreet, Inc. [hereinafter D&B] for summary judgment in which it maintains the following:

1) Any information made available by D&B to its subscribers is subject to a qualified privilege and there is no evidence of malice sufficient to overcome the privilege;

2) Plaintiff has no claim for damages stemming from any republication of the allegedly defamatory material; and

54

    3)    Plaintiff has no claim for punitive damages because there is no evidence of malice sufficient to sustain an award of punitive damages and plaintiff did not make a written demand for retraction five days prior to filing suit, as required by Alabama law.

Plaintiff MedPartners, Inc. [hereinafter MedPartners], currently known as Caremark Rx, Inc., was organized in 1993 as a physician practice management company through which it entered into long-term agreements with physician practices to provide for the management of those practices. The company grew quickly primarily through acquisitions. Among its acquisitions was Pacific Physician Services, Inc. [hereinafter Pacific Physician], another physician management company. As of December 31, 1997, MedPartners was one of the largest healthcare companies in the United States, affiliated with over 280 physician practices. Its net revenue was approximately $6.3 billion.

At the time MedPartners acquired Pacific Physician, Pacific Physician was affiliated with North Carolina Medical Associates, Inc.[hereinafter NCMA]. On December 27, 1996, MedPartners, MedPartners Acquisition Corporation [hereinafter MAC],[1] and NCMA had entered into a Clinic Services Agreement [hereinafter CSA] by which it would provide management services,

---

[1] MAC was at that time a wholly-owned subsidiary of MP of Delaware, Inc., a wholly-owned subsidiary of MedPartners.

facilities, personnel, equipment, and supplies to NCMA in exchange for a management fee.[2] MedPartners owned no stock in NCMA.[3]

Defendant D&B is a major commercial credit reporting corporation, contracting with subscribers for financial information on particular businesses in the D&B database. Information is made available on request via "Business Information Report" which contains multiple items of information on a particular business; report containing only a certain item of information (i.e. bankruptcy filing); report containing current information on a business; or a report by which a business can be monitored over a period of time.

On Thursday, August 20, 1998, NCMA, doing business as Raleigh Family Physicians [hereinafter RFP] and as Wake Forest Family Medicine,[4] filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of North Carolina.[5] Later that day Martha Johnson, an

---

[2] The services were actually performed by a third-tier subsidiary of the plaintiff (explained in n.1), rather than by the plaintiff itself.

[3] It would have been illegal for MedPartners to own all or any of the stock in NCMA. All shareholders in a professional corporation are required to be licensed to practice medicine in North Carolina. 21 N.C.A.C. 32C.0005(6).

[4] RFP and Wake Forest Family Medicine were both trade styles for NCMA.

[5] The only effect that the bankruptcy of NCMA on MedPartners was that
(continued...)

3

independent contractor for D&B telephoned the NCMA bankruptcy information to Alana McSwain, a D&B employee. All three names listed in the bankruptcy petition were on the D&B bankruptcy reporting form. The entry in the D&B system showed that RFP was a "branch" of MedPartners. Although the name MedPartners did not appear on the screen the MedPartners DUNS number assigned to plaintiff by D&B was shown, as well as its address. Ms. McSwain entered the bankruptcy information into the report for MedPartners, listed as the headquarters of RFP, and then separately on the report for RFP. The system automatically listed MedPartners as the bankruptcy entity in the headquarters report. the entry read as follows:

> On August 20, 1998 MEDPARTNERS, INC, filed a voluntary petition in bankruptcy in US BANKRUPTCY COURT, RALEIGH, NC under Chapter 11 of the United States Bankruptcy Act. Attorney is DAVID W. BOONE, 919 782-1441, Raleigh, NC. File Number is 98-01878. Judge THOMAS SMALL is presiding. The following figures have been filed with the court: Total Assets $500,000 and Total Liabilities $1,000,000. On August 20, 1998 a petition was filed.

On the same page the "Earnings Update" indicated plaintiff had revenue of $3,495,782,000 for the six months that ended June 30, 1998. Other information

---

[5](...continued)
MedPartners acquired rights as a creditor under the United States Bankruptcy Code.

4

listed further down the page included an announcement that plaintiff intended to sell a $700 million division, and an acknowledgment that a $1 billion credit facility had been completed by MedPartners. The report showed a vast incongruity in the financial situation of MedPartners and the financial information indicated.

Republication of the bankruptcy of MedPartners was reported by the media with wide distribution.

Upon learning of the erroneous report, Edward L. Hardin, Jr., General Counsel for MedPartners, attempted to call Volney Taylor, Chief Executive Officer of D&B. He spoke with Mr. Taylor's assistant Nelson Randolph concerning the false and defamatory report. Mr. Hardin requested that a retraction be sent to everyone who had received the erroneous report, an apology letter be sent to MedPartners, and that a retraction be sent out over the major business wires. He stressed that time was of the essence. Mr. Hardin followed the telephone call via facsimile with a "Demand for Retraction," dated August 24, 1998.

Mr. E. Mac Crawford, President and Chief Executive Officer of MedPartners, called D&B and requested a public retraction.

5

The parties differ on their interpretation of events from this point onward. Plaintiff lists numerous examples of evidence sufficient to show malice on the part of the defendant--malice which would defeat defendant's claim of "qualified privilege." Defendant contends that its actions, protected by "qualified privilege," fall within acceptable standards and cannot be construed as evidence of malice. Both parties refer the court to the recent decision of *Blue Cross and Blue Shield of Alabama*, 2000WL 739594 (Ala., Jun 09, 2000) which the court attaches to and incorporates into the opinion. Interpretation of the disputed facts is clearly within the province of the jury.

Parties, too, differ on the issue of republication liability. D&B relies on the traditional rule as set forth in *Barnette v. Wilson*, 706 So. 2d 1164, 1167 (Ala. 1997): "Normally, the original publisher of a defamation is not responsible for the consequences of its repetition by others." Plaintiff also cites *Barnette*, at 1167: "[W]hen the original publisher of a defamatory statement might reasonably expect the statement to be repeated, the original publisher is responsible for the damage that results from that repetition of the slander." At issue is whether the rule or the exception, set forth below, applies:

> [R]esponsibility rests upon one who publishes a libel for its repetition to the extent that it so intended, or was the natural and probable result

6

of the original publication, as where it was known that some person
receiving it would naturally or probably or ought reasonably so repeat
it. Those are questions for the jury when the evidence is sufficient to
reach a reasonable conclusion to that effect.

*Bridwell v. Brotherhood of Railroad Trainmen et al*, 150 So. 338, 341 (Ala. 1933).

The last issue before the court concerns plaintiff's claim for punitive damages. Under Alabama law, prerequisites to recovery for punitive damages are set forth by statute, cited below:

> Vindictive or punitive damages shall not be recovered in any action
> for libel on account of any publication unless (1) it shall be proved
> that the publication was made by the defendant with knowledge that
> the matter published was false, or with reckless disregard of whether
> it was false or not, and (2) it shall be proved that five days before the
> commencement of the action the plaintiff shall have made written
> demand upon the defendant for a public retraction of the charge or
> matter published; and the defendant shall have failed or refused to
> publish within five days, in as prominent and public a place or
> manner as the charge or matter published occupied, a full and fair
> retraction of such charge or matter.

Ala. Code § 6-5-186 (1993).

Plaintiff did make a written demand for a retraction, but filed suit prior to the running of the five days' requisite period. The court understands the emergency situation with which plaintiff was faced, but counsel did not respond to the "five day rule" argument, let alone direct the court to any case law on the books in which an exception has been made to the rule in cases of extreme

7

emergency. If such law exists, and plaintiff brings it to the attention of the court within ten days of the entry of this order, the court will be willing to reconsider the ruling pertaining to punitive damages. Because plaintiff has apparently conceded the "five day rule," the court holds that the defendant's motion for summary judgment on the issue of punitive damages is granted.

    Since, however, the issues before the court dealing with qualified immunity and damages stemming from republication are those properly decided by a jury, the court denies the motion of defendant for summary judgment on these issues. An order consistent with this opinion is being entered contemporaneously herewith.

    DONE and ORDERED this 23rd day of October 2000.

_____
UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.

2000 WL 739594 Page 1
(Cite as: 2000 WL 739594 (Ala.))

Only the Westlaw citation is currently available.

NOT YET RELEASED FOR PUBLICATION.

Supreme Court of Alabama.

Ex parte BLUE CROSS AND BLUE SHIELD OF ALABAMA.
(Re Winston Guthrie, D.M.D.
v.
Blue Cross and Blue Shield of Alabama).

1980260.

June 9, 2000.

Dentist brought action against insurer for defamation and tortious interference with contract by writing letters to explain denial of coverage. The Circuit Court, Madison County, CV-95-2037, entered summary judgment in favor of insurer. Dentist appealed. The Court of Civil Appeals reversed and remanded. Certiorari was granted. The Supreme Court, Johnstone, J., held that: (1) the defendant need not plead the absence of actual malice to establish a qualified privilege, overruling Kenney, 95 So. 34; (2) the insurer had a privilege to send the letters; and (3) the insurer could not tortiously interfere with the dentist's contractual relations.

Reversed and rendered.

Maddox, J., concurred in the result.

[1] Libel and Slander ⬥41

237k41

[1] Libel and Slander ⬥51(1)
237k51(1)

The defense of qualified privilege is not subject to any condition, but is simply subject to the qualification, or limitation, that it suffices against only claims for innocent or mistaken defamation and not against claims for defamation committed with actual malice.

[2] Libel and Slander ⬥50
237k50

[2] Libel and Slander ⬥51(1)
237k51(1)

Bad faith and actual malice are not two separate elements of defamation against a qualified privilege; rather, the term "in good faith" means the same as the term "without actual malice," and the term "in bad faith" means the same as the term "with actual malice."

[3] Libel and Slander ⬥101(4)
237k101(4)

The plaintiff must plead defamation with actual malice and bears the burden of proving defamation with actual malice to prevail against a defense of qualified privilege, and the defendant need not plead good faith (the absence of actual malice) and does not bear the burden of proving good faith to establish the defense of qualified privilege; overruling Kenney v. Gurley, 95 So. 34.

[4] Libel and Slander ⬥100(5)
237k100(5)

To establish the affirmative defense of a qualified privilege to make an allegedly defamatory statement, the defendant need only plead and prove a duty to the public or a third party or the interest of the defendant and the recipient in the communication.

[5] Libel and Slander ⬥41
237k41

The affirmative defense of qualified privilege will defeat a claim of innocent or mistaken defamation, because this defense negates the malice implied by the mere falsity of a defamatory statement.

[6] Libel and Slander ⬥51(1)
237k51(1)

The only variety of defamation not subject to the defense of qualified privilege is defamation committed with actual malice.

[7] Libel and Slander ⬥100(5)
237k100(5)

A plaintiff cannot prevail against an established defense of qualified privilege unless he has pleaded and proved defamation committed with actual

malice.

**[8] Libel and Slander** ⟳45(2)
237k45(2)

Health insurer had a qualified-privilege to send allegedly defamatory letters explaining to insureds the denial of coverage; the insurer owed each of its insureds an explanation for the denial of payment, it had an interest in the explanations, and each insured had a corresponding interest.

**[9] Libel and Slander** ⟳51(1)
237k51(1)

Qualified privilege is a complete defense to all defamation except that committed with actual malice.

**[10] Torts** ⟳12
379k12

Any duty owed by health insurer not to write letters explaining denial of coverage was excused by dentist's invitation to write the letters, and, thus, the letters were not tortious interference with the dentist's contractual relations with his patients.

**[11] Torts** ⟳12
379k12

Health insurer could not tortiously interfere with dentist's contractual relations with his patients, where the insurer was part of interdependent contractual relations among the dentist and his patients in a medical service plan; the insurer was a party to the contract.

**[12] Torts** ⟳12
379k12

While the rights and duties between different sets of parties to a multiparty contract may differ and the respective interests of the parties may compete, the performance of one of the duties or the pursuit of one of the competing interests cannot be validly branded as tortious interference.

**[13] Torts** ⟳12
379k12

A medical insurer's explaining a claim denial to its insured cannot constitute a tortious interference in the contractual relations between the insured and his or her medical provider.

PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CIVIL APPEALS (Madison Circuit Court, CV-95-2037; Court of Civil Appeals, 2970472)

JOHNSTONE, Justice.

*1 The petitioner-plaintiff, Winston Guthrie, D.M.D., sued Blue Cross and Blue Shield of Alabama for defamation, malicious defamation, and tortious interference with contractual relations. The trial court entered summary judgment in favor of Blue Cross on all three claims. On Dr. Guthrie's appeal, the Court of Civil Appeals reversed the summary judgment and remanded. Guthrie v. Blue Cross & Blue Shield of Alabama, [Ms. 2970472, August 28, 1998] --- So.2d ---- (Ala.Civ.App.1998). On certiorari review pursuant to the petition of Blue Cross, we reverse the judgment of the Court of Civil Appeals and render a judgment for the defendant Blue Cross.

While the opinion issued by the Court of Civil Appeals presents the facts in detail, the operative facts material to Dr. Guthrie's defamation claim are, in essence, simply that Blue Cross wrote a letter to each of two of its own insureds and Dr. Guthrie's patients, Reasoner and Cantrell, explaining to the particular patient that Blue Cross was denying payment for certain procedures performed on the patient on the ground that the procedures were outside the scope of Dr. Guthrie's license as a dentist; and that Blue Cross wrote each of those letters in response to a letter from that particular insured patient asking why Blue Cross had denied payment. After Dr. Guthrie sued Blue Cross on the theory that each of these two letters defamed him, Blue Cross moved for summary judgment on the ground of qualified privilege--that is, the defense that the qualified privilege of Blue Cross to write each letter prevented the letters from being actionable.

Over the last 150 years some confused and anomalous language has developed in our cases on defamation and conditional privilege. We will clarify and restate the law.

[1] At the outset we note that some cases refer to

conditional privilege, see, e.g., Tidwell v. Winn-Dixie, Inc., 502 So.2d 747 (Ala.1987), and Webster v. Byrd, 494 So.2d 31, 36 (Ala.1986), and others refer to qualified privilege, see, e.g., Mead Corp. v. Hicks, 448 So. 308 (Ala.1983), and Ripps v. Herrington, 241 Ala. 209, 1 So.2d 899 (1941). Indeed the two terms have been used interchangeably. Gore v. Health-Tex, Inc., 567 So.2d 1307 (Ala.1990); Barnett v. Mobile County Personnel Bd., 536 So.2d 46, 53 (1988); Browning v. Birmingham News, 348 So.2d 455, 458 (Ala.1977); Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117 (Ala.1977); Smith Bros. & Co. v. Agee & Co., 178 Ala. 627, 59 So. 647 (1912). However, we will henceforth use the term qualified privilege, because, as we discuss and hold, the defense is not subject to any condition but is simply subject to the qualification, or limitation, that it suffices against only claims for innocent or mistaken defamation and not against claims for defamation committed with actual malice.

Language in some cases implies that good faith and the absence of actual malice are essential elements of the defense of qualified privilege. Clark v. America's First Credit Union, 585 So.2d 1367, 1370 (Ala.1991); Gore, 567 So.2d at 1308; Atkins Ford Sales, Inc. v. Royster, 560 So.2d 197, 200 (Ala.1990); Reynolds Metals Co. v. Mays, 547 So.2d 518, 524 (Ala.1989); Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1094 (Ala.1988); Kirby v. Williamson Oil Co., 510 So.2d 176, 179 (Ala.1987); Tidwell, 502 So.2d at 748; WKRG-TV, Inc. v. Wiley, 495 So.2d 617, 619 (Ala.1986); Webster, 494 So.2d at 36; Montgomery v. Big B, Inc., 460 So.2d 1286, 1288 (Ala.1984); Mead Corp., 448 So. at 312; Fulton v. Advertiser Co., 388 So.2d 533, 537 (Ala.1980); Browning, 348 So.2d at 458; Willis, 336 So.2d at 1120; Berry v. City of New York Ins. Co., 210 Ala. 369, 371, 98 So. 290 (1923). Other cases hold or imply that bad faith and actual malice are essential elements of the only variety of defamation that will prevail over a defense of qualified privilege. Barnett, 536 So.2d at 53, and Nelson, 534 So.2d at 1095. The significance of this conflict is that the burden of proof on faith (good or bad) and the absence or existence of actual malice would seem to be upon the party whose position includes them as essential elements, for generally a plaintiff bears the burden of proving the essential elements of his claims, King v. Aird, 251 Ala. 613, 38 So.2d 883 (1949), United States Cast Iron Pipe & Foundry Co. v. Williams, 213 Ala. 115, 104 So. 28 (1925), and Metropolitan Life Ins. Co. v. Brown, 27 Ala.App. 602, 177 So. 178 (1937), and the defendant bears the burden of proving the essential elements of his affirmative defenses, Aird, supra, Horton v. Spears, 238 Ala. 464, 191 So. 622 (1939), United States Cast Iron Pipe & Foundry Co. v. Williams, 213 Ala. 115, 104 So. 28 (1925), and APJI 8.01 (2d ed.1993). One case even holds that, while the defendant asserting qualified privilege must plead the absence of actual malice, the plaintiff bears the burden of proving the existence of actual malice. Kenney v. Gurley, 208 Ala. 623, 95 So. 34 (1923).

*2 [2] Our first clarification prompted by these cases is that the matters of faith and actual malice are not two separate essential elements. Rather, the term good faith was intended as the opposite of the term actual malice. The term in good faith means the same as the term without actual malice. Smith Bros., supra. Whenever these two terms are used conjunctively, one is redundant. Likewise the term in bad faith means the same as the term with actual malice. Barnett and Nelson, supra. Whenever these two terms are used conjunctively, one is redundant.

[3][4] Our next clarification and restatement is that the plaintiff must plead defamation with actual malice and bears the burden of proving defamation with actual malice to prevail against a defense of qualified privilege, Fulton, Browning, Willis, and Kenney, supra. See also O'Barr v. Feist, 292 Ala. 440, 296 So.2d 152 (1974); and the defendant need not plead good faith (the absence of actual malice) and does not bear the burden of proving good faith to establish the defense of qualified privilege. To the extent that Kenney, supra, requires the defendant to plead the absence of actual malice, it is overruled. Rather, to establish this affirmative defense, the defendant need only plead and prove the elements as stated in the following authorities.

*3 " '[N]otwithstanding the tendency of the words to defame or disparage the plaintiff, they were ... spoken or published ... in the ... discharge of some legal or moral duty to society, or even in the fair and honest prosecution of the rights of the party himself, or the protection of his interests....' 2 Starkie Ev. 863."
Easley v. Moss, 9 Ala. 266, 268 (1846).
" 'Where a party makes a communication, and such communication is prompted by duty owed

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged.... The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is ... moral in its nature....' "

Berry v. City of New York Ins. Co., 210 Ala. 369, 371, 98 So. 290 (1923). See also Clark v. America's First Credit Union, 585 So.2d 1367, 1370 (Ala.1991); Gore v. Health-Tex, Inc., 567 So.2d 1307, 1308 (Ala.1990); Atkins Ford Sales, Inc. v. Royster, 560 So.2d 197, 200 (Ala.1990); Reynolds Metals Co. v. Mays, 547 So.2d 518, 524 (Ala.1989); Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085 at 1094 (Ala.1988); Kirby v. Williamson Oil Co., 510 So.2d 176, 179 (Ala.1987); Tidwell v. Winn-Dixie, Inc., 502 So.2d 747, 748 (Ala.1987); WKRG-TV, Inc. v. Wiley, 495 So.2d 617, 619 (Ala.1986); Webster v. Byrd, 494 So.2d 31, 36 (Ala.1986); Montgomery v. Big B, Inc., 460 So.2d 1286, 1288 (Ala.984); Mead Corp. v. Hicks, 448 So. 308, 312 (Ala.1983); Fulton v. Advertiser Co., 388 So.2d 533, 537 (Ala.1980); Browning v. Birmingham News, 348 So.2d 455, 458 (Ala.1977); Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117, 1120 (Ala.1977).

"Where the defendant acted in the discharge of any public or private duty, whether legal or moral, which the ordinary exigencies of society, or his own private interest, or even that of another, called upon him to perform, the law simply ... gives protection to the defendant...."

*4 APJI 23.12 (2d ed.1993). Some references to good faith and, alternatively, to the absence of actual malice on the part of the defendant have been eliminated from these quotations purposely in order to leave only the elements to be pleaded and proved by the defendant asserting the affirmative defense of qualified privilege.

[5][6][7] The affirmative defense of qualified privilege so pleaded and proved will defeat a claim of innocent or mistaken defamation, because this defense negates the malice implied by the mere falsity of a defamatory statement. Lawson v. Hicks, 38 Ala. 279, 285 (1862), and APJI 23.12, supra. The only variety of defamation not subject to the defense of qualified privilege is defamation committed with actual malice (as distinguished from implied malice). See, e.g., Easley and APJI 23.12, supra. A plaintiff cannot prevail against an established defense of qualified privilege unless he has pleaded and proved defamation committed with actual malice. Fulton, Browning, Willis, O'Barr, and Kenney, supra.

[8] In the case presently before us, we will assume, for the purpose of analysis only, that the letters by Blue Cross to its insureds, Dr. Guthrie's patients, Reasoner and Cantrell, are defamatory. The writing and delivery of the letters nonetheless meets each of two independently sufficient criteria for qualified privilege. The record establishes explicitly and implicitly that Blue Cross owed each of its insureds an explanation for the denial of payment for the particular procedures and, likewise, that Blue Cross had an interest in the explanations and each of its insureds had a corresponding interest. Thus the qualified-privilege defense asserted by Blue Cross in its motion for summary judgment is factually established.

[9] As we have explained, qualified privilege is a complete defense to all defamation except that committed with actual malice. The record does not contain substantial evidence that Blue Cross wrote and delivered the letters with actual malice. Therefore, summary judgment in favor of Blue Cross on the defamation claims was not erroneous.

We will now address Dr. Guthrie's claims against Blue Cross for intentional interference with his contractual relations with Reasoner and Cantrell. Dr. Guthrie claimed that the same letters that grounded his defamation claims further constituted tortious interference in his dentist-patient contractual relations with Reasoner and Cantrell. Before Blue Cross wrote the letters to Reasoner and Cantrell, however, Dr. Guthrie had written Blue Cross a letter which stated, in pertinent part:

"In response to your letter of 28 February 95, it has always been my position that patients should have full access to all information concerning their health and contractual benefits.... I trust that you will choose to exercise your legal obligation ... and fully disclose to my patients, in writing, the rationale for your decision to deny payment of my services."

(Emphasis in original.) Dr. Guthrie admitted in his deposition that, before he wrote this letter, he had established a practice of informing his patients that

2000 WL 739594     Page 5
(Cite as: 2000 WL 739594, *4 (Ala.))

"you need to be aware that Blue Cross, I believe wrongfully, but nevertheless that Blue Cross has taken the position that these services may not be covered because they are outside the scope of dental practice."

*5 [10] For two independently sufficient reasons, Dr. Guthrie's claims of tortious interference were subject to the summary judgment entered by the trial court. First, Dr. Guthrie can hardly claim that, after he invited Blue Cross to write the letters to his patients, Blue Cross interfered by writing the letters to his patients. The essential elements of a tort include a breach of a duty imposed by law. If, arguendo only, Blue Cross ever owed Dr. Guthrie a duty not to write the letters, that duty was excused by Dr. Guthrie's inviting Blue Cross to write the letters.

[11][12][13] Second, while Dr. Guthrie charged Blue Cross with interfering with his contractual relations with his patients Reasoner and Cantrell, Blue Cross was, itself, a party to these same contractual relations. The record establishes both explicitly and implicitly that Dr. Guthrie and his patients contracted together in reliance on the contractual obligation of Blue Cross to pay for dental services covered by the policy between Blue Cross and the patients. Interdependent contractual relations existed among Dr. Guthrie, his patients, and Blue Cross. This contractual situation invokes the rule that a party to a contract cannot be charged with interfering with that contract. Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238 (Ala.1992), and Lolley v. Howell, 504 So.2d 253 (Ala.1987). While the rights and duties between different sets of parties to a multiparty contract may differ and the respective interests of the parties may compete, the performance of one of the duties or the pursuit of one of the competing interests cannot be validly branded as interference. A holding (as we do not hold) that a medical insurer's explaining a claim denial to its own insured could constitute a tortious interference in the contractual relations between the insured and his or her medical provider, would so unjustly prejudice the rights of insureds throughout Alabama that such a holding could not be a true tenet of our common law. Accordingly, we specifically hold that a medical insurer's explaining a claim denial to its insured cannot constitute a tortious interference in the contractual relations between the insured and his or her medical provider. Thus the trial court did not err in entering summary judgment in favor of Blue Cross on Dr. Guthrie's claims of tortious interference.

Because the summary judgment was appropriate on all the claims for defamation and tortious interference, the Court of Civil Appeals erred in reversing the trial court. Accordingly, we reverse the judgment of the Court of Civil Appeals and render a judgment in favor of the defendant-petitioner Blue Cross.

REVERSED AND JUDGMENT RENDERED.

HOOPER, C.J., and HOUSTON, COOK, SEE, LYONS, BROWN, and ENGLAND, JJ., concur.

MADDOX, J., concurs in the result.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works